No. 17-56006

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

TRESONA MULTIMEDIA, LLC, an Arizona limited liability company,

*Plaintiff-Appellant,*

vs.

BURBANK HIGH SCHOOL VOCAL MUSIC ASSOCIATION;
Ellie Stockwell and John Doe Stockwell, a married couple; Marianne
Winters and John Doe Winters, a married couple; Geneva Tarandek
and John Doe Tarandek, a married couple; Lorna Consoli and John
Doe Consoli, a married couple; Charles Rodriguez and Jane doe
Rodriguez, a married couple,

*Defendants-Appellees*

APPEAL FROM THE USDC, CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES

THE HONORABLE STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE
CASE NO. 2:16-CV-04781-SVW-FFM

## APPELLEES BURBANK HIGH SCHOOL VOCAL MUSIC ASSOCIATION, ET AL.'S ANSWERING BRIEF

Marc Karish (State Bar No. 205440)
A. Eric Bjorgum (State Bar No. 198392)
Vincent Pollmeier (State Bar No. 210684)
KARISH & BJORGUM, PC, 119 E. Union Street, Suite B
Pasadena, CA 91103
Telephone:    (213) 785-8070 Facsimile:  (213) 995-5010

Attorneys for Defendants-Appellees Burbank High School Vocal
Music Association, et al.

1

# TABLE OF CONTENTS

Pages

JURISDICTIONAL STATEMENT ............................................................. 1

INTRODUCTION ...................................................................................... 1

STATEMENT OF ISSUES ........................................................................ 2

STATEMENT OF CASE ........................................................................... 2

STATEMENT OF FACTS .......................................................................... 3

    A. The Boosters Club ...................................................................... 3

    B. Tresona ........................................................................................ 4

    C. The Copyrights ........................................................................... 4

    D. Performance of the Copyrights .................................................. 6

    E. Summary Judgment .................................................................... 7

SUMMARY OF ARGUMENT .................................................................. 8

ARGUMENT ............................................................................................. 9

  I. Standard of Review ......................................................................... 9

  II. The Burbank High School Vocal Music Association and the
Burbank High School Vocal Music Association Boosters Club are Distinct
Entities ...................................................................................................... 9

  III. Defendant Carroll Was Not Part of the Boosters Club .................... 10

  IV. The District Court Correctly Held That *Sybersound* is Still Good
Law ........................................................................................................... 10

  V. The District Court Correctly Found No Evidence That the Boosters
Club Engaged in Any Infringement ......................................................... 13

    A. The Boosters Club Derived No Financial Benefit from Any Alleged
Infringement ............................................................................................. 14

    B. There is no Evidence that the Boosters Club Derived Financial
Benefit from The Actual Performance of and Excerpt from the Song
"Magic" .................................................................................................... 17

    C. The Boosters Club had No Control Over Music Selection .............. 19

## TABLE OF CONTENTS

### (Continued)

                                                                  Pages

VI.   Even if Tresona Had Standing to Sue on "(I've Had) the Time of My
Life", "Hotel California", and "Don't Phunk with My Heart" Defendants
Could Not be Held Liable for Infringement............................................. 21

CONCLUSION ............................................................................................ 22

# TABLE OF AUTHORITIES

Pages

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) . 14

*Bosch v. Ball-Kell*, 2006 WL 2548053, at *12 (DC Ill Aug. 31, 2006) ....... 14

*Broadcast Music, Inc. v. Hobi, Inc.*, 1993 WL 404152, at *3 (M.D. La. June 24, 1993) .................................................................................................. 14

*Burdick v. Koerner*, 988 F. Supp. 1206, 1210 (E.D. Wis. 1998) ................ 20

*Cambridge University Press v. Becker*, 2010 WL 11507617, slip op., *9 (ND Ga. Sept 30, 2010) ............................................................................ 14

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013) ......................................................................................................... 19

*Corbello v. DeVito*, 777 F.3d 1058, 1065-1066 (9th Cir. 2015) ................ 12

*Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004) ................... 14, 17

*EPF v. Total Music Connection*, 2015 WL 12655484 (C.D. Cal. 2015) ..... 12

*F.E.L. Publications, Ltd. v. National Conference of Catholic Bishops*, 466 F. Supp. 1034, (ND Ill, 1978) ....................................................................... 14

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S. Ct. 1023, 1025, 127 L. Ed. 2d 455 (1994) ................................................................................................ 13

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ........... 15

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) .................................................................................................. 15

*Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011) ................. 9

iii

## TABLE OF AUTHORITIES
### (Continued)

Pages

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005) ..................................................... 14

*Monotype Imaging, Inc. v. Bitstream, Inc.*, 2005 WL 936882, at *7 (N.D. Ill. April 21, 2005) ........................................... 17

*Moore v. USC University Hosp., Inc.*, 416 Fed.Appx. 640, 641 (9th Cir. 2011) .................................................................. 9

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) 19

*Perfect 10, Inc. v. Giganews, Inc.*, WL 8628031 at *4 (C.D. Cal. Nov. 14, 2014) .................................................................. 14

*Religious Technology Center v. Netcom On-Line Comm. Svcs.*, Inc., 907 F. Supp. 1361, 1377 (N.D. Cal. 1995) .......................... 18

*Roy Export Co. Establishment v, Turstees of Columbia University*, 344 F. Supp. 1350 (SDNY 1972) ......................................... 14

*Sybersound*, *supra* 517 F.3d at 1146 .......................................... 11

*Van Halen Music v. Palmer*, 626 F. Supp. 1163, 1167 (W.D. Ark. 1986) .. 20

*Wolk v. Kodak Imaging Network, Inc.,* 840 F.Supp.2d 724, 748 (S.D.N.Y.2012) .................................................................. 18

**Other Authorities**

17 U.S.C. § 201 ................................................................... 11

17 U.S.C. § 501(b) .............................................................. 10

17 U.S.C. §§ 101 *et seq* ...................................................... 1

28 U.S.C. §§ 1331 and 1338 .................................................. 1

## JURISDICTIONAL STATEMENT

The District Court exercised subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because Tresona Multimedia, LLC's ("Appellant" or "Tresona") claims arise under 17 U.S.C. §§ 101 *et seq*. The District Court entered final judgment for Ellie Stockwell and John Doe Stockwell, Marianne Winters and John Doe Winters, Geneva Tarandek and John Doe Tarandek, Lorna Consoli and John Doe Consoli, and Charles Rodriguez and Jane Doe Rodriguez ("Defendant Volunteers" and "Defendant Spouses") on January 11, 2017. (ER 442.) The District Court entered final judgment for the Burbank High School Vocal Music Association (the "Boosters Club") on June 15, 2017. (ER 1.)

## INTRODUCTION

This case involves allegations of copyright infringement regarding arrangements of four songs sung by the high school show choir at Burbank High School. Appellant Tresona Multimedia LLC ("Appellant" or "Tresona") is a company in Arizona that aggregates and administers the rights to "custom arrangement licenses," selling most of these licenses to school choirs and bands. Tresona sued the Boosters Club, a section 501(c)(3) non-profit organization, the Boosters Club's Board of Directors consisting of volunteer parents of high school students (the "Defendant Volunteers"), and the board members' spouses (the "Defendant Spouses") (collectively "Appellees" or "Defendants").[1] All of Tresona's claims were

---

[1] Plaintiff also sued Defendant-Appellee Brett Carroll, the school district employee who works with the choirs, and who is represented by separate

1

defeated in successive motions for summary judgment, and now Tresona challenges the District Court's rulings as to Brett Carroll and the Boosters Club. This Answering Brief addresses Tresona's challenges to the District Court's ruling as to the Boosters Club. Appellees request that this Court affirm the District Court's grant of summary judgment in favor of the Boosters Club.

## STATEMENT OF ISSUES

1. Whether Tresona has standing to assert claims against the Boosters Club for copyright infringement of the songs "(I've Had) The Time of My Life," "Hotel California," and "Don't Phunk With My Heart."

2. Whether the District Court erred when it concluded that the Boosters Club was not liable for direct or vicarious copyright infringement.

## STATEMENT OF CASE

The Operative Complaint in this case was filed on June 29, 2016. (ER 452.) These Defendants filed their respective Answers on or about August 25, 2018. On December 12, 2016, the Volunteer Defendants moved for summary judgment on the basis of statutory immunity for volunteers of non-profits. (Supp. Excerpts of Record ("SER") 0096.) On January 11, 2017, the District Court dismissed the Defendant Volunteers and the Defendant Spouses from the case on the grounds that the Defendant Volunteers were not on the board of the Burbank High School Boosters Club when the alleged infringement occurred. (SER 82.) On January 9, 2017, the Boosters Club moved for summary judgment. (SER 84.) On February 22, 2017, the District Court granted Summary Judgment for the Boosters Club finding that

---

counsel. Mr. Carroll has submitted a separate Answering Brief in response to Tresona's Opening Brief.)

there was no evidence that the Boosters Club directly or vicariously infringed Plaintiff's rights. (SER 07.)

On March 6, 2017, Tresona filed a Motion for reconsideration, which was subsequently denied on June 6, 2018. (SER 01). The District Court entered final judgment for all Defendants on June 15, 2017. (ER 1.)

## STATEMENT OF FACTS

### A.    The Boosters Club

The Boosters Club is a non-profit organization qualified under section 501(c)(3) of the Internal Revenue Code. (SER 85.) The Boosters Club has no employees or staff members handling day-to-day operations. (SER 86.) The Boosters Club's chief function is to help raise funds and assist with the logistics of the Burbank High School Show Choirs ("Choirs") because many of the students at Burbank High School (a public school) cannot afford the cost of participating in the choir. Intermediate students must pay $1,050 per year to participate in the Choirs, and advanced students pay $3,400 per year. (SER 86.) These fees cover the cost of travel and costumes for the students. The chief function of the Boosters Club is to oversee the distribution of grants to students who cannot pay the participation fees. (SER 86.)

Each year, the Boosters Club begins fundraising in the fall, while the Choirs practice. In the spring, the Choirs compete. (SER 86.) Typically, the Choirs will compete in four or five competitions and one out-of-state competition per year. (SER 86.) For the out-of-state competition, the Boosters Club coordinates transporting 150 students, their chaperones and a live band by plane to a competition for what is typically a four-night stay with many additional activities. (SER 86.) Last year, the cost of the out-of-state trip was approximately $155,000. The Boosters Club has two opportunities to generate funds for the Choir students. (SER 85.) The first

is the "Burbank Blast" which is a competition held at Burbank High School where 40 school choirs perform. The second fundraising opportunity is in the spring "Pop" show, which is professionally lit and staged.

### B.  Tresona

Tresona is a music licensing company operated out of Arizona by Mark Greenburg. (ER 453) Tresona's apparent focus is to sell custom arrangement licenses to school choirs and bands, for use in teaching music as part of their educational curriculum. (ER 454, 455)

### C.  The Copyrights

Tresona is not listed as a registered owner for any of the copyrighted works in this case. (ER 377-390) Tresona has failed to produce records showing PEN Music and Royalty Network – the entities from whom Tresona supposedly obtained its rights/licenses – hold exclusive rights or received an assignment of ownership rights from the registered copyright owners. Instead, Tresona has provided unsupported conclusions that it received exclusive rights from these non-registered entities. (Opening Brief, p. 15-16; ER 191)[2] Even if the chain of title is to be believed for the works "Don't Phunk with My Heart," "Hotel California," and "(I've Had) The Time of My Life," Tresona's alleged interest was granted by less than 100% of the actual copyright owners for these songs, and there is no indication that Tresona has been assigned any ownership interest for those copyrights.

---

[2] Tresona's citation to ER 243-248 and 249-255 contains absolutely no information about what songs are subject to the attached agreements. Moreover, Tresona provides no agreements from the actual rights holders that clearly identify what rights, if any, have been assigned or licensed to PEN and Royalty Network. Greenburg's declarations related to chain of title are incompetent evidence, containing hearsay statements and lacking foundation.

With regard to "Don't Phunk With My Heart," Tresona's interest comes from Royalty Network. (Opening Brief, p. 16) Royalty Network is not a registered owner and its supposed rights, which remain unclear, do not come from the writers/producers of the work in question, but from the writers of a song that was minimally sampled in "Don't Phunk With My Heart" – Kalyanji Anandji and Indivar Anandji. (ER 345, 387-390) In fact, the Anandjis make up only 2 of the 26 individuals/entities named on the Public Copyright Catalog for the song in question. (ER 345, 387-390) None of the agreements submitted by Tresona indicate that Royalty Network received an exclusive license or an assignment of ownership rights for the copyrighted work, "Don't Phunk With My Heart." (ER 249-255) At best, Tresona received a non-exclusive license to issue licenses, from an unregistered third party, related to a song that was merely sampled in the primary song at issue. (ER 387-390.)

Regarding "Hotel California," Tresona's interest is again derived from an entity not registered on the Copyright, PEN Music Group. (Opening Brief, p. 15) PEN's supposed rights come from Fingers Music Publishing, only 1 of the 8 individuals/entities named on the Public Copyright Catalog for the song. (ER 243-248; ER 383-385; SER 189, 195-198) Once again, none of the agreements submitted by Tresona indicate that PEN received an exclusive license or an assignment of ownership rights for the copyrighted work "Hotel California." (ER 243-248; SER 195.) Thus, Tresona was, at best, granted a non-exclusive license to issue licenses, from an unregistered third party, on behalf of 1 of the 8 registered owners.

Like the other songs, Tresona's interest in "(I've Had) The Time of My Life" comes from an unregistered entity, PEN Music Group. (Opening Brief, p. 15) PEN's supposed rights to this song come from Donald

Markowitz and his assignee, Calspen Music, which make up 1 of the 4 individuals/entities named on the Public Copyright Catalog for the song. (ER 243-248; ER 377-378, SER 189, 195-198.) Again, none of the agreements submitted by Tresona indicate that PEN received an exclusive license or an assignment of ownership rights for the copyrighted work "(I've Had) The time Of My Life." (ER 243-248, SER 196-197.) Therefore, Tresona received – at most – a non-exclusive license to issue licenses, from an unregistered third party, on behalf of 1 of 4 registered owners.

Tresona claims to have received licensing rights from PEN for the copyrighted work "Magic." (Opening Brief, p. 15) Like the other songs, neither Tresona nor PEN is a registered copyright owner and the chain of title is cloudy at best. (ER 380-381.) PEN purports to have received some unidentified rights from John Farrar Music (BMI). (SER 198.) However, the only record reflecting an agreement between the registered copyright holder and PEN, does not identify the song "Magic" and does not indicate that an exclusive license was granted or an assignment of ownership rights occurred. (SER 198) Accordingly, again, Tresona holds – at best – a license from a non-registered third party.

### D. Performance of the Copyrights

Portions of Tresona's claimed songs were performed at different times over the course of several years. In particular, "Magic" was performed in the 2010-2011 school year (ER 393) and "(I've Had) The Time of My Life" was performed during the 2013-2014 school year (ER 392). Indisputably, the Burbank High School Choir did not perform "Don't Phunk With My Heart" and "Hotel California." Those songs were performed by John Burroughs High School during the 2014-2015 and 2015-2016 school years. (ER 124, 126; Opening Brief, p. 8.) Notably, John Burroughs obtained

licenses from Tresona for "Don't Phunk With My Heart" and "Hotel California." (3 ER 344, lines 23-28.) Yet, Tresona still asserts that Defendants infringed the copyrights for "Don't Phunk With My Heart" and "Hotel California" because John Burroughs performed the arrangements licensed through Tresona during the Burbank Blast, a high school choir competition hosted by BHS. (Opening Brief, p. 16)

All performances of these songs took place in high school auditoriums, and the Boosters Club had no supervisory control over Defendant Carroll or any arranger. The Boosters Club received no monetary or other personal benefit from the performances of the Choirs – because the Boosters Club is a non-profit organization – but also because the purpose of the Boosters Club was to generate funds for the high school students' participation.

### E. Summary Judgment

After one round of depositions and discovery, Defendant Carroll filed a motion for summary judgment, and on December 22, the Court granted that motion for Defendant Carroll on the grounds of qualified immunity, while also finding that Plaintiff lacked standing on three of the songs, so that only one song ("Magic") remained in the case. "Magic" was performed in the 2010-2011 choir season. Following the Summary Judgment Order (DKT. Mo. 135), the only song remaining at issue was "Magic," of which a 20-second portion was performed repetitively by the Burbank High School choir "In Sync" as part of a larger piece called "Rainmaker" during the 2011 Choir Season.

On December 12, 2016, the Volunteer Defendants moved for summary judgment on the basis of statutory immunity for volunteers of non-profits. Following the granting of Defendant Carroll's motion, the Court asked for briefing on whether the Volunteer Defendants were liable for

events occurring in 2010-2011, and it held they were not. (SER 096.) The only remaining defendant in the case at that point was the non-profit Boosters Club that also filed a motion for summary judgment based on fair use and Plaintiff's inability to prove liability for contributory or vicarious infringement. On February 6, 2017, the District Court held a lengthy hearing on the final motion for summary judgment and, possibly realizing there were serious problems with Plaintiff's case, continued the trial and gave the parties further time for briefing. (SER 18.) During that hearing, it became evident that Plaintiff had no viable case against the Boosters Club because Plaintiff went so far as to engage the Court in a lengthy discussion of whether performance rights were infringed by the professional musicians, even though Plaintiff knew the only right at issue in this case was a derivative right to create arrangements – not perform them. (SER 18.) A week later, the District Court held a brief hearing and issued a minute order granting summary judgment because there was no evidence that the Boosters Club was directly or vicariously liable for the Choir's song selection and arrangement. (SER 82) A more detailed order followed. (SER 81.)

## SUMMARY OF ARGUMENT

The Burbank High School Vocal Music Association and the Burbank High School Vocal Music Association Boosters Club are distinct entities. The Boosters Club is sometimes referred to as the Vocal Musical Association or the VMA, but it cannot realistically be disputed that the Boosters Club is a separate entity whose official name is the Burbank High School Vocal Music Association Boosters Club. Defendant Carroll was not head of or a member of the Boosters Club; Defendant Carroll had no official capacity with the Boosters Club and did not regularly attend its board meetings.

8

The District Court correctly found that *Sybersound* is still good law, and the District Court correctly found no evidence that the Boosters Club engaged in any infringement (direct, vicarious or contributory) of Tresona's alleged arrangement licenses. The Boosters Club is a 501(c)(3) organization that is by definition a not-for-profit entity. It is not possible for a non-profit organization to derive a "direct financial benefit" required for vicarious infringement. Indeed, the District Court correctly found that the "Boosters Club provided ancillary assistance to the direct infringers, but did not engage in any decisions regarding the purchasing of a license or even the use of certain music," – meaning, the Boosters Club had no legal right or practical ability to control and supervise this alleged infringing activity.

## ARGUMENT

### I. Standard of Review

While the appropriate standard of review for granting summary judgment is "de novo," *see*, *Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011), this "de novo" review only extends to evidence "before the district court when the summary judgment motion was decided…." *Moore v. USC University Hosp., Inc.*, 416 Fed.Appx. 640, 641 (9th Cir. 2011); *see*, *Glenn*, *supra* 673 F.3d at 870 (Summary Judgment is decided based on "the pleadings, the discovery and disclosure materials *on file*….").

### II. The Burbank High School Vocal Music Association and the Burbank High School Vocal Music Association Boosters Club are Distinct Entities

The District and BHS generally refer to the BHS choir program as the BHS Vocal Music Association ("VMA"), which is meant to encompass the classes and extracurricular activities. (ER 394.) Throughout this case, Plaintiff has made much of this loose nomenclature, trying to imply that

there is something called the "VMA" that is a separate entity or that might employ Brett Carroll outside of his job as a teacher. Despite this sometimes clumsy use of acronyms, it cannot realistically be disputed that the Boosters Club is a separate entity named the Burbank High School Vocal Music Association Boosters Club – or the Boosters Club. (*E.g.* ER 41-42, 49, 52, 54, 61-62.) The Boosters Club is a non-profit boosters club operated by volunteer parents of students in the choir program, whose chief functions are to raise funds and assist with logistics for the BHS vocal music program. (1 ER 10; 2 ER 74, 83, 129, 154) The Boosters Club has no employees or staff members handling daily operations, it makes no profits, and it does not profit off of individual songs performances. (ER 74-75).

## III. Defendant Carroll Was Not Part of the Boosters Club

Defendant Carroll has no official capacity with the Boosters Club, and does not regularly attend its board meetings. (ER 76, 157; ER 393; Respondent Carroll's Supplemental Excerpts of Record ("Carroll SER") 162:13-163:10.) In fact, Defendant Carroll only attended Boosters Club meetings when requested by the board to provide an update. (Carroll SER 175:12-176:8.) Tellingly, the Burbank Schools Boosters Association Compliance Paperwork, prepared by the Boosters Club, named Defendant Carroll as the "Teacher Liaison/Coach" and did not list him as an officer of the Boosters Club.

## IV. The District Court Correctly Held That *Sybersound* is Still Good Law

The Copyright Act very clearly indicates that only a "legal or beneficial owner of an exclusive right under a copyright is entitled... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). A nonexclusive

license simply does not confer the right to file an infringement suit. *See*, 17 U.S.C. § 201. *Sybersound* expressly states that co-owners of a copyright cannot grant an exclusive license to a licensee without the consent of the other co-owners because such a license is, by its nature, non-exclusive. *Sybersound*, *supra* 517 F.3d at 1146.

In *Sybersound,* one of several joint owners attempted to grant an exclusive license without the consent of the other co-owners, and the Court found that the agreement at issue could only confer a non-exclusive license and therefore Sybersound lacked standing to sue. *Ibid*. Tresona failed to identify anything in *Minden* or any other binding authority to suggest this Circuit "was departing from the holding in *Sybersound*."

*Minden* confirmed the well-settled principle that the owner of a copyright can subdivide his/her interest in exclusive rights, and it reiterated the uncontested proposition that only "an assignment (which transfers legal title to the transferee) of an exclusive license (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in a copyright for purposes of the Act." *Minden*, 795 F.3d at 1002-1003. *Minden* held that a non-exclusive license does not confer standing to sue. *Ibid*.

The facts of *Minden* differ significantly from those in *Sybersound,* and the *Minden* Court had no reason to address any portion of *Sybersound's* ruling (dealing with co-owners and licensing joint copyrighted works).[3]

---

[3] Even the District Court in *Minden* expressly acknowledged that there was "no case squarely addressing the precise question raised in [that] case." *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2014 WL 1724478, at *7 (N.D. Cal. 2014). Had *Sybersound* been applicable, there would have been existing precedent to review.

11

*Minden* involved a sole copyright owner who granted an exclusive license to issue licenses to the plaintiff. *Id*. at 1005. The Court appropriately determined that the sole copyright owner was permitted to grant an exclusive license to issue licenses and the exclusive licensee had standing to sue to enforce that agreement. *Ibid*. The *Minden* court refered to *Sybersound* with approval. *Minden*, 795 F.3d at 1003.

Notably, this Circuit has already rejected the argument set forth by Tresona as a basis for overturning *Sybersound*. Specifically, Tresona claims *Sybersound*'s reasoning is faulty because it "would mean that a co-owner of a copyright can never effectively transfer a partial interest in a copyright." (AB p. 32.) In 2015 (long after the supposed criticism of *Sybersound* in 2011), this Circuit held that the standing limitation addressed by *Sybersound* does not "limit a co-owner's ability to transfer unilaterally any exclusive copyright interests that he himself possesses." *Corbello v. DeVito*, 777 F.3d 1058, 1065-1066 (9th Cir. 2015) (affirming the holding of *Sybersound*).

The Central District of California tested Tresona's exact arguments here and rejected them. *See*, *EPF v. Total Music Connection*, 2015 WL 12655484 (C.D. Cal. 2015). In short, Tresona's arguments related to standing were addressed and rejected by 2015. Thus, there is no basis for Tresona to challenge the ruling of *Sybersound*.

Even if there were some ambiguity as to whether *Sybersound* remained good law or whether a co-owner could unilaterally grant an exclusive license the evidence in this case simply does not support the claim that Tresona holds exclusive rights for "(I've Had) The Time of My Life," "Hotel California," or "Don't Phunk With My Heart." As noted by the District Court in this matter: Tresona received its rights from PEN and The Royalty Network. These entities, themselves not co-owners of the copyrights

12

at issue, received their rights from less than 100% of copyright owners for the songs "(I've Had) the Time of My Life", "Hotel California", and "Don't Phunk with My Heart." (3 ER 344, 373-375, 407-420) [1] It is undisputed that the agreements produced by Tresona only granted a license to issue use licenses, with reservations of rights by PEN and Royalty Network to issue the same. (Carroll SER 169-181.) Accordingly, Tresona holds a license granted by a licensee, who did not receive approval from all of the copyright owners. There has been no transfer of title or other splitting of ownership rights, let alone an agreement granting Tresona some kind of exclusive right. At best, Tresona shares a non-exclusive license with PEN or Royalty Network, which was granted by only a small portion of the copyright owners in question.

Finally, Tresona's policy arguments work both ways. Ultimately, this Court must consider the reality of the world imagined by Tresona: a place where fractional copyright rights holders can sue or even seek injunctions with impunity. This would wreak havoc on creativity, and it would certainly not promote the goals of copyright law of encouraging expression *for the public good. Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S. Ct. 1023, 1025, 127 L. Ed. 2d 455 (1994) ("However, the Copyright Act's primary objective is to encourage the production of original literary, artistic, and musical expression for the public good.")

## V.    The District Court Correctly Found No Evidence That the Boosters Club Engaged in Any Infringement

Vicarious liability requires a showing that the Boosters Club derived a direct financial benefit from the infringement and had the right and ability to

supervise the infringing activity. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005); *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir.2004). A financial benefit means that the availability of infringing material "acts as a 'draw' for customers." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001). However, it is important to note that a plaintiff must prove a "direct causal link between the infringing activities *at issue in this case* and a direct financial benefit" to the defendants. *Perfect 10, Inc. v. Giganews, Inc.*, WL 8628031 at *4 (C.D. Cal. Nov. 14, 2014) (emphasis in original).

### A. The Boosters Club Derived No Financial Benefit from Any Alleged Infringement

Inherent in the case law is the premise that a party – whether or not it is actually *making* a profit – must be *intending* to make a profit from the allegedly infringing activity in order to "derive a financial benefit." *See, e.g. Roy Export Co. Establishment v, Turstees of Columbia University*, 344 F. Supp. 1350 (SDNY 1972) (no vicarious infringement where university did not receive financial benefit from unauthorized showing of film, even though student organization charged admission fees); *F.E.L. Publications, Ltd. v. National Conference of Catholic Bishops*, 466 F. Supp. 1034, (ND Ill, 1978) (finding no vicarious infringement where no showing of financial benefit to non-profit defendant organization); *Bosch v. Ball-Kell*, 2006 WL 2548053, at *12 (DC Ill Aug. 31, 2006) (no vicarious liability where no evidence of direct financial benefit to professor at non-profit educational institution); *Cambridge University Press v. Becker*, 2010 WL 11507617, slip op., *9 (ND Ga. Sept 30, 2010) (no evidence to support conclusion that state university profited from allegedly infringing activity); *see also, Broadcast Music, Inc. v. Hobi, Inc.*, 1993 WL 404152, at *3 (M.D. La. June 24, 1993)

14

("Nguyen still has a direct financial interest in the infringing activity if the bar is a for-profit enterprise and the defendant benefits from its operation. The fact that the Bengal may not be making a profit does not make it a non-profit organization. The Bengal is still a bar which is operated with a goal of making a profit.").

This is where the analysis ends. The Boosters Club is a 501(c)(3) organization, (SER 083) – it is by definition a not-for-profit entity. It is not possible for a non-profit organization to derive a "direct financial benefit" and maintain its not-for-profit status. Tresona attempts to blur the facts here to make it seem like the Boosters Club derives a direct financial benefit from performance of allegedly infringing music because it generates revenue by charging admissions fees to raise funds so that public high school students can continue to perform. However, the fact that money has exchanged hands does not make the Boosters Club "a profit-making enterprise." *See Major Bob Music,* 851 F.Supp. at 480 ("a profit-making enterprise which publically performs copyrighted musical compositions is deemed to do so *for profit*" (emphasis added)). The Boosters Club members do not take home, save or derive any benefit from money generated by the Boosters Club – in fact, all monies generated by the Boosters Club are funneled right back into the show choirs' operational and administrative costs for future student performances – the very definition of a not-for-profit organization.

Tresona points to two cases – *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) and *Re Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) – in support of its argument; however, Tresona's cases are inapposite. In *Fonovisa*, the court found vicarious liability because the defendant, a swap meet operator, derived a "direct financial benefit" from the infringement of its vendors. 76 F.3d at

15

262.  It is undisputed that the swap meet was a for-profit business; the swap meet operator knew its vendors were selling infringing materials, and the operator allowed them to continue – all the while, pocketing a fee from its vendors who were also making a profit.  The swap meet operator did not funnel 100% of those fees back into the operational and administrative costs of the swap meet – as it would be required to do if it were a not-for-profit organization.  Instead, the swap meet operator kept profits, and derived a direct financial benefit.

In *Gershwin*, the court found vicarious infringement when a music festival promoter – CAMI – derived a direct financial benefit from performances of infringing works at music festivals put on by promoter. 443 F.2d at 1161.  However, in *Gershwin*, the court expressly noted the various ways in which the promoter benefitted financially from the enterprise.  *See Id.*, ("CAMI therefore makes money through the reimbursement of its expenses, plus a percentage for profit for the nurturing of local associations; and artists who perform before the association's audiences pay a commission to CAMI for management.") And CAMI knew of the infringing activity, and the local community concert associations that actually sponsored the concerts were not named in the lawsuit for vicarious infringement – presumably because the local organizations were operating as non-profit organizations. *Id.*  None of the facts in *Gershwin* are applicable to the facts here.

Indeed, the case here is more like *Roy Export* where the defendant, a university, did not receive financial benefit from the unauthorized showing of a film on campus, and the court found no vicarious infringement.  344 F. Supp. at 1353.  In *Roy Export*, a student organization showed a bootleg copy of a film without authorization, and even *charged admission fees*. However,

the court noted that even though the university was aware of the infringing activity and had control of its premises, the university "received no financial benefit from the two showings of the film." *Id.* The *Roy Export* court noted that financial benefit is a "vital" element of a claim for vicarious infringement, and without it, the plaintiff could not make even a limited showing of probable success on the merits. *Id.* Indeed, the court went on to note that all of the cases finding vicarious infringement are "permeated with the profit motive." *Id.* Just as in *Roy Export*, Tresona here cannot demonstrate a financial benefit to the Boosters Club to make a claim for vicarious infringement.

### B. There is no Evidence that the Boosters Club Derived Financial Benefit from The Actual Performance of and Excerpt from the Song "Magic"

The Ninth Circuit has held that an "essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004). In *Ellison,* the Ninth Circuit affirmed the district court's grant of summary judgment based on a lack of vicarious copyright infringement because the plaintiff failed to submit any evidence of the requisite causal relationship. This Court noted that "there is no evidence that indicates that [Defendant's] customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available." *Id.*; *see also Monotype Imaging, Inc. v. Bitstream, Inc.*, 2005 WL 936882, at *7 (N.D. Ill. April 21, 2005) ("Because Plaintiffs have failed to set forth any evidence demonstrating a direct causal relationship between the alleged infringement and [defendant's] financial

benefits, the Court grants summary judgment on the issue of vicarious copyright infringement.")

It is not enough for Tresona to show that the show choir's performance of music in general acted as a draw; Tresona must present evidence that the show choir's performance of "Magic" drew customers. *Religious Technology Center v. Netcom On-Line Comm. Svcs.*, Inc., 907 F. Supp. 1361, 1377 (N.D. Cal. 1995) (granting summary judgment on claim for vicarious infringement in defendant's favor because "[t]here is no evidence that infringement by [defendant], or any other user of [plaintiff's] services, in any way enhances the value of [plaintiff's] services to subscribers or attracts new subscribers."); *Wolk v. Kodak Imaging Network, Inc.,* 840 F.Supp.2d 724, 748 (S.D.N.Y.2012) (no evidence of direct financial benefit for purposes of vicarious infringement where there was "no evidence indicating that either [of the defendants] capitalizes specifically because a given image a user selects to print is infringing" and because "Defendants' profits are derived from the service they provide, not a particular infringement."); *Perfect 10*, WL 8628031 at *4 (granting summary judgment in defendants' favor because "there is simply no evidence in the record that the availability of the copyrighted works at issue in this action . . . ever influenced a single subscriber's binary decision to subscribe or not subscribe); *c.f. Napster*, 239 F.3d at 1013-1014 (finding vicarious infringement where defendants' service was almost exclusively designed to download and upload copyrighted music and there was no need to establish that the specific infringing material acted as a draw to customers – nearly the entire service was devoted to infringing copyrights).

Here, Tresona has not shown a direct causal link between the segment of "Magic" performed at its show choir recitals and a financial benefit

18

derived from that performance. Tresona has not – and cannot – put forward any evidence that the performance of "Magic" led to a direct benefit to the Boosters Club. The Burbank high school show choirs attracted friends and family to their audiences, people wanting to see their sons and daughters perform. Friends and families did not purchase tickets based on the selection of songs to be performed – and certainly not based on the promise of a performance of a segment of the song "Magic."

### C. The Boosters Club had No Control Over Music Selection

Even if the Boosters Club derived a profit from the performance of "Magic," Tresona cannot show that the Boosters Club had legal right or the practical ability to stop any alleged infringing activity. *Ellison*, 357 F.3d at 1078. "[I]n order to have the right and ability to control, the service provider must also 'exert substantial influence on the activities of users.'" *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013) (citations omitted). "A defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).

Tresona's reliance on *Fonovisa* and *Gershwin* regarding control is inapplicable to the facts here. The *Fonovisa* case involved a swap meet operator who "had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises" sufficient to satisfy the control element. 76 F.3d at 263. Yet, Tresona failed to show how the Boosters Club could have exercised a similar right – the Boosters Club could not fire Defendant Carroll or Josh Greene or in any other way control their activities, and the District Court agreed. In *Gershwin* the court suggested that the defendant was in a position

19

to police the infringing conduct of its artists "*because the local association depended upon [defendants] for direction in matters such as this*" 443 F.2d at 1163 (emphasis added) – a segment omitted by Tresona in its Opening Brief. Here, neither Defendant Carroll, Mr. Greene nor the Choirs depended on the Boosters Club for direction in matters such as song selection and licensing – quite the opposite. The Boosters Club had almost no input of oversight in the process of selecting music.

The Boosters Club functioned almost entirely as an administrative body to organize the students' high school musical performances. S*ee Van Halen Music v. Palmer*, 626 F. Supp. 1163, 1167 (W.D. Ark. 1986) (finding no vicarious liability for the secretary of a dance club who did not participate "in any decision regarding purchase of a[] [] license" and whose "duties appear to have been entirely administrative"); *see also Burdick v. Koerner*, 988 F. Supp. 1206, 1210 (E.D. Wis. 1998) (finding no vicarious liability for members of the board of directors who were not "sufficiently involved in the day-to-day operation of the company in order to establish that he or she had the right and ability to control the actions of the corporation.") Indeed, the District Court correctly found that the "Boosters Club provided ancillary assistance to the direct infringers, but did not engage in any decisions regarding the purchasing of a license or even the use of certain music."

Tresona has offered no evidence that the Boosters Club had the legal ability to stop any alleged infringing activity. Musical arrangements, their creation or distribution, were not within the purview of the Boosters Club. The Boosters Club did not discuss music arrangements or song selection – and even if the Boosters Club knew (which it did not) of the alleged infringement, as a purely administrative body, it would not have been within the Boosters Club's ability to police any of the alleged infringing activity.

"To find that the Boosters Club exercised control over Greene and Carroll would be analogous to finding that a high school football team's boosters club could tell the coach what plays to run."  (ER 17.)

Tresona argues that the Boosters Club had the ability to police the allegedly infringing activity because it could have refused to commission and pay for unlicensed arrangements. The District Court correctly rejected this argument.  (ER 17.)  Indeed, the District Court considered whether the Boosters Club could police the infringing activity by means of withholding payment, and the Court concluded it "is not enough" in order to establish vicarious infringement.  (ER 17.)  As in *Perfect 10*, any persuasive power the Boosters Club might have had to discourage infringing activity, "falls short of having a *legal right* and *practical ability* to control and supervise this activity." *Id.* (emphasis in original).

## VI. Even if Tresona Had Standing to Sue on "(I've Had) the Time of My Life", "Hotel California", and "Don't Phunk with My Heart" Defendants Could Not be Held Liable for Infringement

Even if Tresona (or any other rightsholder) had standing to sue the Boosters Club on the three dismissed songs, the Boosters Club would still lack the right and ability to supervise the infringing activity – the underlying substantive element of vicarious infringement.  Thus, no plaintiff would be able to make out a prima facie case of infringement against the Boosters Club, even if that plaintiff had standing to sue.  Similarly, even if Tresona had standing to sue the Defendant Volunteers and their spouses on the three dismissed songs, Tresona would not be able to make out a prima facie case against the Defendant Volunteers because the District Court already ruled that the Boosters Club did not infringe – directly or vicariously.  Because the Defendant Volunteers are the individual components of the Boosters Club

21

(*i.e.* the board of directors of the Boosters Club), if the Boosters Club as a whole had no right or ability to control the infringing activity, the Defendant Volunteers as individuals making up the decision-making body, similarly lacked the right or ability to control any infringing activity. Therefore, neither Tresona – nor any other rightsholder – could possibly make out a prima facie case for infringement against the Defendant Volunteers or any member of the Boosters Club board of directors.

## CONCLUSION

The District Court correctly determined that there was no evidence that the Boosters Club directly or vicariously infringed the song "Magic." Even if Tresona – or any other plaintiff – had standing to sue Defendants/Appellees on "(I've Had) the Time of My Life", "Hotel California", and "Don't Phunk with My Heart," Defendants/Appellees could not be liable for infringement. This Court should affirm the District Court's ruling.

July 3, 2018                    Respectfully submitted,


_____
A Eric Bjorgum
KARISH & BJORGUM
119 E. Union Street, Suite B
Pasadena, California 91103
Telephone: 213.785.8070
Facsimile:  213.995.5010
Eric.bjorgum@kb-ip.com

*Attorneys for Defendants-Appellants,*
*Ellie Stockwell, John Doe Stockwell,*
*Marianne Winters, John Doe Winters,*
*Geneva Tarandek, John Doe Tarandek,*
*Lorna Consoli, John Doe Consoli,*
*Charles Rodriguez, and Jane Doe*
*Rodriguez*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[x ] this brief contains 6,134 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains <**state the number of**> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ x] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Point Times New Roman , *or*

[ ] this brief has been prepared in a monospaced typeface using <**state name and version of word processing program**> with <**state number of characters per inch and name of type style**>.

July 3, 2018                              Respectfully submitted,

24

_____

A Eric Bjorgum

KARISH & BJORGUM

119 E. Union St., Suite B

Pasadena, California 91103

Telephone: 213.785.8070

Facsimile:  213.995.5010

eric.bjorgum@kb-ip.com


*Attorneys for Defendants-Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants state that (a) no other appeal from the same civil action in the lower court was previously before this or any other appellate courts (except for Case No. 17-56419 and 17-56006, which are on the same briefing schedule) and (b) there are no other lawsuits known to counsel to be pending in this or any other court that will directly affected by this court's decision in the pending appeal.

/s/ A. Eric Bjorgum

A. Eric Bjorgum

## <u>CORPORATE DISCLOSURE STATEMENT FRAP 26.1</u>

The undersigned counsel for Defendant-Appellants states that the Appellants are not a corporate party and on that ground are exempt from the requirement of filing a Corporate Disclosure Statement pursuant to FRAP 26.1(a).

<u>/s/ A. Eric Bjorgum</u>

A. Eric Bjorgum

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 3, 2018, I electronically filed the foregoing **APPELLEES BURBANK HIGH SCHOOL VOCAL MUSIC ASSOCIATION, ET AL.'S ANSWERING BRIEF** with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


<u>/s/ A. Eric Bjorgum</u>