NO. 17-56006

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

TRESONA MULTIMEDIA, LLC, an Arizona limited liability company,
*Plaintiff-Appellant,*

v.

BURBANK HIGH SCHOOL VOCAL MUSIC ASSOCIATION, et al.,
*Defendants-Appellants.*

---

Appeal from United States District Court for the Central District of California
Civil Case No. 2:16-cv-04781-SVW-FFM

---

APPELLANT'S RELY BRIEF

(UNDER SEAL)

Brad A. Denton
DENTON PETERSON, P.C.
1930 N. Arboleda Rd., Suite 200
Mesa, Arizona 85213
Tel.:(480) 325-9900
Fax: (480) 325-9901
brad@dentonpeterson.com
*Attorneys for Appellant Tresóna*
*Multimedia, LLC*

i

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES ................................................... iv

ARGUMENT ........................................................................ 1

I.   Qualified immunity should not protect Carroll from his infringement. .......... 1

   A.  Carroll was not acting as a public school teacher when he infringed the copyrights. ..................................................................... 1

   B.  It was clearly established that creating musical arrangements without permission is infringement. ........................................................ 9

   C.  The District Court erred in holding Carroll acted reasonably. .................. 11

II.  Tresóna has standing to bring a copyright claim. ........................................ 12

   A.  Joint owners have standing to sue without permission from other joint owners and to transfer their interest exclusively to others. .............................. 13

      1.   The transferring joint owner had the right to sue without permission or joinder from the other joint owner(s). .......................................... 13

      2.   Therefore, the exclusive transferee likewise receives that same right to sue when it receives an exclusive license—even if the other original joint owners have not transferred rights to the transferee. ..................................... 13

   B.  Carroll's analysis of *Corbello* and *Elohim EPF* is wrong. ......................... 15

   C.  Carroll's and the Booster Club's arguments about chain of title should be disregarded because the District Court did not rule on that issue. .................... 17

III.  The District Court erred in determining there was no evidence to find the Booster Club vicariously infringed. ...................................................... 18

   A.  It is not impossible for a non-profit organization to have a "direct financial interest." ................................................................................. 18

   B.  The Booster Club's analysis of *Fonovisa*, *Gershwin*, and *Roy Export Co.* is wrong. ................................................................................. 20

C.   The Booster Club also failed to prevent infringement that it could have prevented................................................................................................24

III.  Conclusion. .......................................................................................25

STATEMENT OF RELATED CASES ...................................................................25

APPELLANT'S ADDENDUM TO OPENING BRIEF ........................................26

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ............... 18, 24

*Bolker v. C.I.R.*, 760 F.2d 1039 (9th Cir. 1985) ....................................................18

*Corbello v. DeVito*, 777 F.3d 1058 (9th Cir. 2015).......................................... 15, 16

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)............................................................13

*Elohim EPF v. Total Music Connection*, 2015 WL 12655484 (C.D. Cal. 2015)....17

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996) ............. passim

*Friedman v. AARP, Inc.*, 855 F.3d 1047 (9th Cir. 2017).......................................17

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159 (2d Cir. 1971) .................................................................................................. 20, 21

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)................................1, 2

*Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006) ..............................10

*Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002).....................................................2

*Leen v. Thomas*, 708 Fed.Appx. 331 (9th Cir. 2017) ............................................17

*Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983)..................................................9

*Minden Pictures, Inc v. John Wiley & Sons, Inc.*, 795 F.3d 997 (9th Cir. 2015) .................................................................................... 13, 15

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988)....9

*Oddo v. Ries,* 743 F.2d 630 (9th Cir. 1984)............................................................9

*Roy Export Co. Establishment v. Trustees of Columbia University*, 344 F. Supp. 1350 (S.D.N.Y. 1972)........................................................... 20, 21, 22

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008) ....... passim

*Walters v. City of St. Louis, Mo.*, 347 U.S. 231 (1954) ..........................................17

iv

**Statutes**

17 U.S.C. § 101 ......................................................................... 9, 10, 16

17 U.S.C. § 201(d) ..............................................................................16

17 U.S.C. § 201(d)(1)..........................................................................14

17 U.S.C. § 501(b) ..............................................................................12

26 U.S.C. § 501(c)(3)..................................................................... 19, 20

California Education Code § 49011(a) ...................................................6

**Treatises**

David Nimmer, NIMMER ON COPYRIGHT § 6.10[A][2][d] ............................... 14, 16

## ARGUMENT

Two Answering Briefs were filed in response to Tresóna's Opening Brief. Pursuant to Circuit Rule 28-5, Tresóna responds to both Answering Briefs in this Reply Brief.

## I.     Qualified immunity should not protect Carroll from his infringement.

Tresóna appealed the District Court's findings that (1) Carroll was acting as a public employee, and (2) Carroll met his qualified immunity burden in this case.

### A.     Carroll was not acting as a public school teacher when he infringed the copyrights.

As a preliminary matter, the issue of whether Carroll was acting in his public capacity should have been submitted to the fact-finder. Although qualified immunity is an issue of law, the Ninth Circuit requires a factfinder to resolve disputed legal issues that may be involved in the inquiry before determining, as a matter of law, whether qualified immunity applies. In this case, whether Carroll was acting in his public capacity when he violated copyrights is a threshold factual issue that should have been submitted to the fact-finder.

This Court has previously recognized that such factual inquiries must be resolved by the fact-finder before a court may rule on the issue of whether qualified immunity applies. One such case is *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), where this Court reversed and remanded a district court's ruling in favor of qualified immunity because there were disputed fact issues. That

1

case addressed whether a group of police officers had used excessive force when they shot and killed a man. *Id.* at 869-70. The trial court granted qualified immunity, holding "the officers' use of force did not violate Kukus Glenn's Fourth Amendment rights." *Id.* at 870. On appeal, the Ninth Circuit reversed and remanded, explaining:

> In this case, the district court focused on whether the officers' use of force violated Lukus' Fourth Amendment rights, and held that it did not. Glenn argues on appeal that the district court erred in granting summary judgment on that basis. We agree that genuine issues of fact remain, and accordingly reverse. We further conclude that resolution of these issues is critical to a proper determination of the officers' entitlement to qualified immunity.

*Id.* Tresóna provided abundant evidence that Carroll was not acting in his role as a public employee. In the face of disputed material issues, the District Court should have submitted the issue to the fact-finder for resolution.

Carroll does not dispute the premise that to "receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002), and that, therefore, if Carroll was not acting in his public capacity, he is not entitled to qualified immunity protection. And Tresóna does not dispute that Carroll had a job as a teacher in a public school. What is disputed is whether Carroll was acting as a public teacher when he commissioned, copied, and distributed unlicensed musical arrangements for the

2

Competition/Traveling Show Choirs (as opposed to the separate Classroom Choirs).

The District Court relied on Carroll's conclusory testimony that "all his actions related to Tresóna's infringement claims were within the scope of his duties as a music teacher for Burbank High School," and held "there is no evidence that Carroll acted beyond the scope of his duties as a teacher for Burbank High School." ER 29. The District Court ignored extensive evidence showing, among other things:

- The Competitive/Traveling Show Choirs were intentionally separate from the Classroom Choirs Carroll taught during the school day;

- Carroll was the *de facto* head of the Competitive/Traveling Show Choirs;

- Carroll acted as the head of the private Booster Club entity that made the Competitive/Traveling Show Choirs possible;

- Carroll was acting on behalf of the separate, privately funded Competitive/Traveling Show Choirs, not the public Classroom Choirs, when he infringed; and

- The Competitive/Traveling Show Choirs require their participants to pay thousands of dollars to participate, which they could not do if it was a school activity.

*See* Tresóna's Opening Brief pp. 24-40. Carroll does not meaningfully address any of these points in his Answering Brief, except to say that Tresóna "makes mountains of mole hills." Carroll's Answering Brief at 26.

Even when Carroll does respond to the points in the Opening Brief, his assertions mostly contradict the record. For example, Carroll asserts that he was acting as a public teacher because the Competitive/Traveling Show Choirs were comprised of participants who were also BHS choir students, and that the Competitive/Traveling Show Choirs comprised "part of their education at BHS." Carroll's Answering Brief at 25. That is false. The Competitive/Traveling Show Choir program's own "Welcome Pack" documentation shows that, although there was some overlap in participants between the two types of choirs, the choirs were very different. For example, the Competitive/Traveling Show Choirs were not intended to be a part of the free education received at the high school. Regarding the Classroom Choirs, the Welcome Pack explains that "[t]here is no fee associated with our music classes during the instructional day," which "teach the student to sing," "offers skill-based learning in music and receives an academic grade for participation in class." ER 41, 61. Then it explains that the Competitive/Traveling Show Choirs are "different" and participation in them is "completely voluntary" and does "not affect any student's class learning or grade." ER 41, 61. Carroll informed the participants' parents that financial contributions are required for the

4

Competitive/Traveling Show Choirs to "maintain our costuming and show production, etc. at a professional level" in order to maintain its status as "a nationally competitive choir program." ER 64. And unlike the Classroom Choirs, which were included in the students' free public education, a contractual agreement to pay thousands of dollars was required just to participate in the Competitive/Traveling Show Choirs. ER 42, 62.

Carroll argues that the Booster Club was designed to support the "school choir." Carroll's Answering Brief at 25. But that did not prevent it from also supporting the separate, privately funded Competitive/Traveling Show Choirs.

Carroll argues that he does not hold a formal office with the Booster Club. Carroll's Answering Brief at 25. But the evidence shows he was nonetheless the *de facto* head of the Competitive/Traveling Show Choir program and the Booster Club, which made the Competitive/Traveling Show Choir program possible. Carroll, not the Booster Club, hires and communicates with choreographers, arrangers and accompanists. ER 162-62, 170-71. Carroll decides which competitions to attend and makes travel arrangements. ER 163-64. Carroll, not the Booster Club, hires the arrangers to make custom arrangements and tells the Booster Club to pay for them. ER 186. Carroll's authority at the Booster Club over copyright issues is shown by the fact that Booster Club officer Charles Rodriguez specifically reached out to Carroll to learn whether proper copyright

licenses had been obtained. Apparently Rodriguez did not know the answer and believed Carroll did. ER 554-59. Carroll even used his authority to conceal licensing information from the official Booster Club officers. He wrote to Rodriguez, "I'm not at liberty at this point to discuss the situation more at this point-but we are fine and the school district is dealing with him," but then acknowledged that he had been keeping Rodriguez "in the dark because he would cause trouble." ER 569.

Further, Carroll, not the Booster Club, interfaces with choir participants who have difficulty paying their contractually required participation fees. ER 42, 64. And Carroll is the point person for fielding invoices, negotiating rates, instructing the Booster Club's treasurer when to pay vendors, and actually delivering payment. ER 525-26, 529-31, 535, 539, 541-43, 548.

Carroll argues that he was paid by the District. But that pay was for his school teacher activities (including the Classroom Choirs and their extra-curricular activities), not for the separate Competitive/Traveling Show Choirs. In fact, the parties' actions before this lawsuit confirm that no one considered Carroll's actions in leading the Competitive/Traveling Show Choirs to be within his scope of employment with the school district. That is because California law prohibits schools from charging students for extra-curricular activities. California Education Code § 49011(a) ("A pupil enrolled in a public school shall not be required to pay

6

a pupil fee for participation in an educational activity"). Carroll seeks to sidestep this history by characterizing the money required to participate as "voluntary." Carroll's Answer Brief at 26. But the evidence is that participants' families were contractually required to pay thousands of dollars in order to participate in the Competitive/Traveling Show Choirs. ER 42, 62. Even the Booster Club's Answering Brief at 3 concedes that the participants "must pay" these fees.

Carroll argues that if his Competitive/Traveling Show Choir activities were found to be outside his duties as a teacher, then "qualified immunity [could] never be applied to a teacher's actions performed outside the classroom during extracurricular activities." Carroll's Answering Brief at 27. That is false for at least two reasons. First, the Classroom Choirs had an extracurricular component, in which Carroll was involved as part of his duties as a teacher. The parties understood the difference between true extracurricular activities and the entirely separate activities of the Competitive/Traveling Show Choirs. The Welcome Pack explains that the Classroom Choirs have "an extra-curricular element consisting of students performing in mandatory shows, which are Bucco Di Burbank, Night of Magic, The Winter Show and the Spring Concert." ER 41, 61. Second, the Competitive/Traveling Show Choir program is much, much more than—and different in kind from—a typical extracurricular activity. Unlike the Competitive/Traveling Show Choirs, participation in a school newspaper or even

an extracurricular sports team does not contractually require the participating students' families to pay thousands of dollars to participate. Thus, Carroll's involvement in the extracurricular activities of the Classroom Choir would be in his role as a teacher, and could be protected by the doctrine of qualified immunity. But when Carroll acted as leader of the Competitive/Traveling Show Choirs, he stepped into a different role, outside his position as a government employee.

Carroll's argument that a ruling in Tresóna's favor would "have the effect of precluding qualified immunity anytime a school official supervised a student activity that was fully or partially funded by an approved boosters club for a school program" is also wrong. Anytime teachers act in their role as teachers—including in an extracurricular activity—they could be covered by qualified immunity. But in this case, Carroll was not acting as a teacher when he led the Competitive/Traveling Show Choir, for all the reasons stated above and in the Opening Brief.

Carroll was much more than a "liaison" between the school and the Booster Club. The evidence shows that the Competitive/Traveling Show Choirs are not a part of the school. As a result, Carroll's conduct in commissioning, copying, and distributing unlicensed arrangements of copyrighted music had to be outside his role as a public school teacher. Therefore, he cannot be protected by the doctrine of qualified immunity.

**B.    It was clearly established that creating musical arrangements without permission is infringement.**

The law regarding derivative works is clear and it has been for decades. Carroll, however, argues that the law is unclear about whether creating a musical arrangement (such as for a show choir) violates copyright law.  He is wrong.

The law in *Oddo v. Ries,* 743 F.2d 630, 634 (9th Cir. 1984), *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir. 1988), and 17 U.S.C. § 101, all analyzed in the Opening Brief, demonstrate that (1) derivative works violate copyright law, and (2) "musical arrangements" of "preexisting works" are by definition "derivative works."  The arrangement of Magic in this case—originally performed as a solo by Olivia Newton John—into a four-part (soprano-alto-tenor-bass) arrangement is thus a derivative work under the plain language of the statute.  ER256-283; s*ee also* flash drive lodged with the this Court at Docket No. 50.

If Carroll is arguing that the law is not clearly established because there is no law saying a teacher can be liable for copyright infringement, he is wrong.  First, as noted above, Carroll was not acting as a teacher when he commissioned, copied, and distributed copies of the musical arrangement of Magic.  Second, even if he had been acting as a teacher, Ninth Circuit law makes it clear a teacher can be liable.  *See Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983) (public school teacher

liable for infringement after using copyrighted work in a book she used in her school classes).

Carroll asserts that Tresóna tries to show clearly established law by citing to magazine articles. Carroll Answering Brief at 21 and 30. That is not true. Those magazine articles are not provided to establish the law, or even to show that Carroll should have known the law. They are included to show that as early as 2006 and 2009 the music industry at large recognized the preexisting law under 17 U.S.C. 101, which was that musical arrangements of copyrighted works in the show choir context must be licensed. ER 321, 326.

The Ninth Circuit has recognized, "In order to find that the law was clearly established we need not find a prior case with identical, or even materially similar facts. Our task is to determine whether the preexisting law provided the defendants with fair warning that their conduct was unlawful." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006). In this case, the 1976 statute and Ninth Circuit case law since the 1980s have been giving fair warning to people like Carroll for more than 30 years.[1]

---

[1] Although Tresóna's complaint in the trial court asserted copyright violations remedied by three types of industry licenses (custom arrangement licenses, synchronization licenses, and grand rights licenses), Tresóna's appeal only argued the District Court erred in concluding that the law surrounding derivative works (specifically custom arrangement licenses) was not clearly established. Therefore, the infringements addressed by synchronization and grand rights licenses are not at issue in this appeal, and Carroll's arguments relating to those issues are irrelevant.

### C. The District Court erred in holding Carroll acted reasonably.

Carroll argues he acted reasonably because "there was widespread disagreement among public school choirs and industry professionals as it relates to using arrangements of copyrighted material in school performances."[2]  Carroll's Answering Brief at 33.  But he cites no admissible evidence for that assertion—just alleged hearsay statements by unnamed attorneys.  The law was clear when Carroll infringed, it had been clear for decades, and it had been acknowledged in the industry since at least 2006.  ER 321, 326, 329.

There is no evidence that Carroll believed licenses were not required.  But even if he was confused about that, his conduct showed that he remained deliberately uninformed.  He ignored invitations by several people inviting him to learn more about custom arrangement licensing.  ER 189, 158-60, 287-88, 331.  He later refused to get licensing from Tresóna because he didn't like Tresóna and felt Tresóna was a distraction, not because he believed that licensing was not required. Had Carroll acted reasonably, at a minimum he would have done basic research regarding licensing requirements, heeded the repeated urgings of colleagues who told him to get licenses, and proceeded accordingly.  Instead, he put his head in the sand and freely commissioned, copied, and distributed numerous custom

---

[2] The citations Carroll includes here do not support this factual representation.

11

arrangements of copyrighted works, apparently without ever even looking into whether licenses were required. ER 199-205; ER169-170.

Similarly, Carroll never presented evidence that he believed the doctrine of fair use applied. He provided no evidence that he even knew the fair use defense even existed. Thus, the District Court erred in concluding that Carroll was reasonable in believing it would apply.

Carroll seeks to justify himself by asserting that he "was rightly frustrated with Tresóna, which had very aggressively engaged in intimidation tactics to force payment for custom arrangements it did not prepare and it refused to provide documentary support for their alleged ownership of copyrights." Carroll Answering Brief at 34. But this is a fabrication, completely unsupported by the record.

## II. Tresóna has standing to bring a copyright claim.

It is undisputed that only a "legal or beneficial owner of an exclusive right" can bring a copyright case. 17 U.S.C. § 501(b). The trial court incorrectly held Tresóna does not have standing because it does not have an exclusive right. Relying on *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), the trial court held Tresóna did not have an exclusive right to the songs because it derived its copyright rights from fewer than 100% of the copyright owners. ER 22.

### A. Joint owners have standing to sue without permission from other joint owners and to transfer their interest exclusively to others.

It is well-established copyright law that "[t]he right to prosecute an accrued cause of action for infringement is … an incident of copyright ownership," and "it is a right that may be exercised independently of co-owners; a joint owner is not required to join his other co-owners in an action for infringement." *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007). One of the purposes behind the 1976 Copyright Act was to eradicate "much of the doctrine of indivisibility by permitting a copyright owner to transfer any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights to someone else." *Minden Pictures, Inc v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015). Thus, an original joint owner has the right to transfer her rights exclusively to another, and that exclusive transferee receives the transferred rights held by that owner. *Id*.

Tresóna's position, based on the above law, is simple:

1.  The transferring joint owner had the right to sue without permission or joinder from the other joint owner(s).

2.  Therefore, the exclusive transferee likewise receives that same right to sue when it receives an exclusive license—even if the other original joint owners have not transferred rights to the transferee.

In fact, a legal rule that a joint copyright owner cannot transfer its independent rights to enforce the copyright would mean that the co-owner actually does not truly have an ownership interest in the copyright. It would undermine the basic

13

principle that rights under the 1976 Copyright Act are freely transferrable. *See* 17 U.S.C. § 201(d)(1) ("The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession").

As noted in its Opening Brief, Tresóna's position is supported by Nimmer and Patry. Carroll argues that Nimmer and Patry did not criticize *Sybersound* for its holding on standing. Carroll's Answering Brief at 44. That is absolutely false. Standing was the only holding in *Sybersound* relating to copyright, and the court held: "We hold that because Sybersound is neither an exclusive licensee nor a co-owner in the nine copyrights, it lacks standing to bring the copyright infringement claims." *Sybersound*, 517 F.3d at 1146. So standing is the only issue Nimmer and Patry could have criticized when criticizing *Sybersound*. In fact, Nimmer wrote: "The determination of whether a grant is exclusive or non-exclusive depends on the grant … The contrary conclusion in *Sybersound* threatens to vitiate enforcement in general of joint works." David Nimmer, NIMMER ON COPYRIGHT § 6.10[A][2][d] (emphasis added).

A simple example shows why the criticism of Nimmer and Patry is well-founded. If A and B are joint owners, it is well-established that A can sue Z for infringement without B's joinder. But under *Sybersound*, if A exclusively licenses

14

to C her rights in the copyrighted work, then C (who ostensibly now has the same rights that A had), cannot sue Z unless B had joined in A's transfer of rights to C. This non sequitur is what underlies Nimmer's above criticism that *Sybersound* "threatens to vitiate enforcement in general of joint works."

### B.      Carroll's analysis of *Corbello* and *Elohim EPF* is wrong.

Carroll asserts that "only a few months before *Minden*, the Ninth Circuit in *Corbello v. DeVito* … expressly confirmed *Sybersound's* ruling." Carroll's Answering Brief at 41. That is not true—in fact, *Corbello* never even addressed standing or explained the reasoning in *Sybersound*. In *Corbello*, one of the parties tried to argue that *Sybersound* "prohibits a co-owner of a copyright … from transferring that right without permission from his co-owner." *Corbello v. DeVito*, 777 F.3d 1058, 1064 (9th Cir. 2015). Of course, that is not the holding or effect of *Sybersound*. Accordingly, the Ninth Circuit set forth the facts and holding of *Sybersound* to explain that *Sybersound* "merely imposes a standing limitation on copyright assignees and licensees." *Id*. at 1066. Since standing was not at issue in *Corbello,* the court explained that *Sybersound* "need not, and should not, be extended to limit a co-owner's ability to transfer unilaterally any exclusive copyright interests that he himself possesses." *Id*. Thus, *Corbello* summarized *Sybersound* merely to show that it was inapplicable to the facts of that case. The

*Corbello* decision in no way "confirmed *Sybersound's* ruling," as Carroll asserts in

his Answering Brief at 41.

To the contrary, *Corbello* confirmed that *Sybersound* should never have

been interpreted by the District Court to require dismissal of Tresóna's claims.

The *Corbello* Court explained:

> [T]he word "exclusive" in these provisions [17 U.S.C. § 101 and 17
> U.S.C. § 201(d) cannot mean that only sole owners possess
> "exclusive" rights, as such a rule would run directly contrary to
> another well-settled principle of copyright law: the right of one joint-
> owner to sue third-party infringers without joining any of his fellow
> co-owners.

*Corbello*, 777 F.3d at 1065.  Indeed, Nimmer addressed *Corbello's* effect on

*Sybersound*.

> Albeit still nominally bound by circuit precedent, the [*Corbello*] panel
> specified that 'we made clear prior to *Sybersound* that copyrights are
> divisible and that a copyright owner can freely transfer any portion of
> his ownership interests in that copyright; after all, the plain language
> of § 201(d) commands as much.'  A contrary interpretation, *Corbello*
> added, 'would contradict the principle of the free transferability of
> copyright ownership interests.'  This revolution by redefinition
> defangs the harmful results that *Sybersound* wrought."

David Nimmer, NIMMER ON COPYRIGHT § 6.10[A][2][d] (internal citations

omitted).  The "revolution by redefinition" that Nimmer recognized in *Corbello*

confirmed that *Sybersound* should never have been interpreted to require dismissal

of the claims of exclusive licensee, such as Tresóna.

16

Carroll also cites to the unpublished district court decision *Elohim EPF v. Total Music Connection*, 2015 WL 12655484 (C.D. Cal. 2015). But of course that lower court was required to follow *Sybersound*, so *Elohim EPF* is not binding or even relevant to this Court's decision about whether it has abandoned—or should reverse—*Sybersound*.

### C. Carroll's and the Booster Club's arguments about chain of title should be disregarded because the District Court did not rule on that issue.

Carroll and the Booster Club argue Tresóna's licensing agreements and chain of title are insufficient to confer on Tresóna an exclusive license. Carroll's Answering Brief pp. 38-39; Booster Club's Answering Brief pp. 13-14. But the argument is improper because that issue was not presented by Carroll or the Booster Club in the trial court; Tresóna did not have the opportunity to contest that issue; and the trial court did not consider or decide that issue.

The Ninth Circuit's "general rule is that [it] do[es] not consider an issue not passed upon below." *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1057 (9th Cir. 2017). *See also Walters v. City of St. Louis, Mo.*, 347 U.S. 231 (1954) ("Of course, we will not undertake to review what the court below did not decide"); *Leen v. Thomas*, 708 Fed.Appx. 331, 332 (9th Cir. 2017) (because district court omitted discussion of equal protection claim, case remanded to trial court for further proceedings). In the District Court, neither Carroll nor the Booster Club, in their

17

extensive arguments about standing, so much as mentioned the chain of title issue they now raise. It would be manifestly unfair for this Court to take up the chain of title issue now, without Tresóna having had an opportunity to present evidence on it and have the issue decided in the first instance by the District Court.

**III.  The District Court erred in determining there was no evidence to find the Booster Club vicariously infringed.**

Vicarious liability applies when a defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (internal citations omitted).

**A.  It is not impossible for a non-profit organization to have a "direct financial interest."**

As noted above, the Ninth Circuit, as a general rule, "will not consider an issue raised for the first time on appeal." *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir. 1985). The Booster Club argued for the first time in its Answering Brief that a non-profit organization cannot by definition have a direct financial interest, which is one element required to prove vicarious liability. Booster Club's Answering Brief at 15-18; Booster Club's Supplemental Excerpts of Record 00110-00112; Tresóna's Second Supplemental Excerpts of Record 1-16. The

Booster Club has presented no justification to ignore the general rule disallowing review of this new argument.[3]

But even if the new argument were considered by this Court, it would fail. First, none of the cases cited by the Booster Club (*see* the Booster Club's Answering Brief at 15-16) stand for the proposition that a vicarious infringer must intend to make a profit in order to "derive a financial benefit." And in any event, the Booster Club certainly intended for its revenues to exceed its expenses at the fundraisers it sponsored to make money for the Competitive/Traveling Show Choirs. ER75-76; ER83-107. Whether that is called "profits" or "net earnings," *see* 26 U.S.C. 501(c)(3) ("no part of the net earnings of which inures to the benefit of any private shareholder or individual"), the Booster Club held its fundraising performances to raise funds.

The Booster Club argues (without any citation to the law) that "[i]t is not possible for a non-profit organization to derive a 'direct financial benefit' and maintain its not-for-profit status." Booster Club's Answering Brief at 16. To support this incorrect conclusion, it argues (without any citation to the record), "The Boosters Club members do not take home, save or derive any benefit from

---

[3]Along the same lines, Carroll appears to make a statute of limitations argument in his Answering Brief at 9. However, the District Court ruled that a question of fact existed relating to statute of limitations. ER 24-25. Neither Tresóna nor Carroll appealed that ruling, and therefore that issue is not relevant to this appeal.

money generated by the Boosters Club – in fact, all moneys generated by the Boosters Club are funneled right back into the show choirs' operational and administrative costs for future student performances – the very definition of a not-for-profit organization." *Id.* However, the issue is not whether the Booster Club's <u>members</u> are deriving a financial benefit—it is whether the <u>Booster Club</u> is deriving a financial benefit. And even though the Booster Club is prohibited by tax law from distributing net earnings to members in order to maintain its tax exempt status, *see* 26 U.S.C. § 501(c)(3), the Booster Club does benefit financially when it receives admission fees and other revenues at fundraisers.

The Booster Club hosts several fundraisers each year. ER 75. The Booster Club paid the arranger $1,800 to create the derivative work of Magic. ER 76, 118. The two 2010-2011 fundraisers included the infringing custom arrangement of Magic. ER 75, 232, 562-64. And those fundraisers raised funds for the Booster Club. ER 75-76, 91. This shows a financial benefit to the Booster Club from the infringement, which constitutes a "direct financial benefit" for purposes of vicarious liability for copyright infringement.

## B. The Booster Club's analysis of *Fonovisa*, *Gershwin*, and *Roy Export Co.* is wrong.

The Booster Club asserts that the *Fonovisa* case cited by Tresona should not apply to this case because in *Fonovisa* "[t]he swap meet operator did not funnel 100% of those fees back into the operational and administrative costs of the swap

20

meet – as it would be required to do if it were a non-for-profit organization.
Instead, the swap meet operator kept profits, and derived a financial benefit."
Booster Club's Answering Brief at 16-17.  But *Fonovisa* does not say any of that.
It says nothing about whether the swap meet operator was a for-profit company or
whether the proprietor decided to reinvest or distribute any "profits."  The
*Fonovisa* decision merely put forth the rule—applicable in this case as well—that
financial benefit exists where an event operator derived revenue from admission
fees, concession stand sales, and parking fees.  *Fonovisa, Inc. v. Cherry Auction,
Inc.,* 76 F.3d 259, 263 (9th Cir. 1996).  The same point applies to the *Gershwin*
case, which states essentially the same rule, with no reason as to why that rule
would not apply to a non-profit fundraiser as well as a for-profit enterprise.
*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159 (2d Cir.
1971).  Indeed, if the profit/non-profit enterprise were really the key to escaping
vicarious liability, then surely a non-profit Napster would have sprung up by now,
distributing pirated music online without any fear of copyright law liability.

The Booster Club cites *Roy Export Co. Establishment v. Trustees of
Columbia University*, 344 F. Supp. 1350 (S.D.N.Y. 1972), in an effort to persuade
this Court that it did not reap a financial benefit even though it got admission fees
from concerts where the arrangement of Magic was performed.  But in *Roy Export*,
there were two defendants:  the university student group that actually showed the

bootleg film at issue in that case, and the university. *Id*. at 1351. The procedural posture of the trial court ruling was a preliminary injunction, and the student group had consented to the injunction. Only the university objected, so the only issue being evaluated by the trial court was whether the university—not the student group that charged admission to see the movie—was a vicarious infringer.

While the court found that the university had sufficient control to satisfy that prong of the vicarious infringement test, it also ruled that the plaintiff had not shown a "benefit to the University," nor had the plaintiff "refute[d] defendants Trustees' assertion that the University received no financial benefit from the two showings of the bootleg film." *Id*. at 1353. Thus, the injunction was denied against the university. *Id*. Here, by contrast, the Booster Club—the asserted vicarious infringer—<u>is</u> the entity that charged admission fees to observe the infringing arrangement of Magic.

The Booster Club argues that "[f]riends and families did not purchase tickets based on the selection of songs to be performance – and certainly not based on the promise of a performance of a segment of the song 'Magic.'" Booster Club's Answering Brief at 20. However, this argument is very similar to the argument raised and dismissed in *Fonovisa*. In that case, the vicarious infringer defendant argued that the revenues from the swap meet "cannot satisfy the financial benefit prong of the vicarious liability because a commission, directly tied to the sale of

the particular infringing items, is required." *Fonovisa*, 76 F.3d at 263. The Ninth

Circuit rejected the argument, reasoning that "the defendants reap substantial

financial benefits from admission fees, concession stand sales and parking fees, all

of which flow directly from customers who want to buy the counterfeit recordings

at bargain basement prices." *Id.* The Court found in favor of the plaintiff, further

explaining that "the sale of pirated recordings at the Cherry Auction swap meet is a

'draw' for customers, as was the performance of pirated music in the dance hall

cases and their progeny." *Id.*

Here, the performance of the infringing arrangement of Magic (and other

infringed arrangements not at issue in this case), like the bootleg recordings in

*Fonovisa*, acted as a "draw to customers," who paid admission fees <u>to the Booster</u>

<u>Club</u> to watch infringing arrangements that the Booster Club had paid for. If

attendees truly did not care what songs were performed at the Booster Club's

fundraisers, then the Booster Club could have and should have commissioned

numbers that did not copy others' music. But the numbers chosen were

arrangements of popular music—and that surely was a decision calculated to

increase the interest of both performers and attendees, which would in turn

increase gate receipts for the Booster Club.

**C.    The Booster Club also failed to prevent infringement that it could have prevented.**

"To escape imposition of vicarious liability, the reserved right to police must be exercised to its fullest extent.  Turning an eye to detectable acts of infringement for the sake of profit gives rise to liability."  *Napster*, 239 F.3d at 1023.

The Booster Club argues that, unlike the swap meet operators in *Fonovisa* who were vicariously liable because they could terminate vendors, the Booster Club could not "fire Defendant Carroll or Josh Greene or in any other way control their activities."  Booster Club's Answering Brief at 20.  But the right to fire Greene or Carroll or control vague "activities" is not at issue.  What matters is the right to control the infringement.  And in this case, the Booster Club unquestionably <u>did</u> have the right to control the infringement.  The infringing custom arrangement was created for the Competitive/Traveling Show Choirs.  ER 186.  The Booster Club paid for it, ER76, 118, so it would not have been created if the Booster Club had not been willing to pay for it.  And the performances of Magic at the Booster Club's fundraisers required a custom arrangement, because (1) a popular song cannot be performed in the SATB format without the creation of a custom arrangement, and (2) a professional band cannot accompany the show choir without sheet music, which Carroll copied and gave to the band members.  ER169-170, ER256-283.  Further, as the entity that put on the fundraisers where Magic was performed, the Booster Club had the ability not to hold them, thus

24

preventing the use of infringing arrangements. As a result, the infringing custom arrangements were certainly within the policing authority of the Booster Club. At a minimum, this is a disputed issue of fact demonstrating that summary judgment on vicarious liability was improper.

## III. Conclusion.

For the reasons above, this Court should reverse the District Court's ruling and remand with instructions to proceed to trial against all Defendants on all four songs.

<u>**STATEMENT OF RELATED CASES**</u>

Appellant is aware of two other cases in this Court that are related to this appeal: Case No. 17-56417 and Case No. 17-56419.

Dated: August 30, 2018      **DENTON PETERSON, P.C.**

/s/ Brad A. Denton
Brad A. Denton
1930 N. Arboleda Rd., Suite 200
Mesa, AZ 85213
*Attorneys for Appellant*

## <u>APPELLANT'S ADDENDUM TO OPENING BRIEF</u>

### <u>17 U.S.C. §101 ("Derivative Work")</u>

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

### <u>17 U.S.C. § 201</u>

(a) Initial Ownership.—

Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

(b) Works Made for Hire.—

In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written

instrument signed by them, owns all of the rights comprised in the

copyright.

(c) Contributions to Collective Works.—

Copyright in each separate contribution to a collective work is distinct from

copyright in the collective work as a whole, and vests initially in the author

of the contribution. In the absence of an express transfer of the copyright or

of any rights under it, the owner of copyright in the collective work is

presumed to have acquired only the privilege of reproducing and

distributing the contribution as part of that particular collective work, any

revision of that collective work, and any later collective work in the same

series.

(d)  Transfer of Ownership.—

(1)   The ownership of a copyright may be transferred in whole or in part by

any means of conveyance or by operation of law, and may be bequeathed

by will or pass as personal property by the applicable laws of intestate

succession.

(2)   Any of the exclusive rights comprised in a copyright, including any

subdivision of any of the rights specified by section 106, may be transferred

as provided by clause (1) and owned separately. The owner of any

particular exclusive right is entitled, to the extent of that right, to all of the

protection and remedies accorded to the copyright owner by this title.

(e) Involuntary Transfer.—

When an individual author's ownership of a copyright, or of any of the

exclusive rights under a copyright, has not previously been transferred

voluntarily by that individual author, no action by any governmental body

or other official or organization purporting to seize, expropriate, transfer, or

exercise rights of ownership with respect to the copyright, or any of the

exclusive rights under a copyright, shall be given effect under this title,

except as provided under title 11.

## 17 U.S.C. § 501

(a)  Anyone who violates any of the exclusive rights of the copyright owner

as provided by sections 106 through 122 or of the author as provided in

section 106A(a), or who imports copies or phonorecords into the United

States in violation of section 602, is an infringer of the copyright or right of

the author, as the case may be. For purposes of this chapter (other than

section 506), any reference to copyright shall be deemed to include the rights

conferred by section 106A(a). As used in this subsection, the term "anyone"

includes any State, any instrumentality of a State, and any officer or

employee of a State or instrumentality of a State acting in his or her official

capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

(b)  The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

(c)  For any secondary transmission by a cable system that embodies a performance or a display of a work which is actionable as an act of infringement under subsection (c) of section 111, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that television station.

29

(d)   For any secondary transmission by a cable system that is actionable as an act of infringement pursuant to section 111(c)(3), the following shall also have standing to sue: (i) the primary transmitter whose transmission has been altered by the cable system; and (ii) any broadcast station within whose local service area the secondary transmission occurs.

(e)   With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 119(a)(5),[1] a network station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that station.

(f)

(1)   With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 122, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local market of that station.

30

(2)   A television broadcast station may file a civil action against any

satellite carrier that has refused to carry television broadcast signals, as

required under section 122(a)(2), to enforce that television broadcast

station's rights under section 338(a) of the Communications Act of 1934.

## 26 U.S.C. § 501(c)(3)

The following organizations are referred to in subsection (a):

(1) Any corporation organized under Act of Congress which is an

instrumentality of the United States but only if such corporation—

(A) is exempt from Federal income taxes—

(i) under such Act as amended and supplemented before July 18, 1984, or

(ii) under this title without regard to any provision of law which is not

contained in this title and which is not contained in a revenue Act, or

(B) is described in subsection (l).

(2) Corporations organized for the exclusive purpose of holding title to

property, collecting income therefrom, and turning over the entire amount

thereof, less expenses, to an organization which itself is exempt under this

section. Rules similar to the rules of subparagraph (G) of paragraph (25)

shall apply for purposes of this paragraph.

(3) Corporations, and any community chest, fund, or foundation, organized

and operated exclusively for religious, charitable, scientific, testing for

public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

## Cal. Educ. Code § 49011

(a) A pupil enrolled in a public school shall not be required to pay a pupil fee for participation in an educational activity.

(b) All of the following requirements apply to the prohibition identified in subdivision (a):

(1) All supplies, materials, and equipment needed to participate in educational activities shall be provided to pupils free of charge.

(2) A fee waiver policy shall not make a pupil fee permissible.

(3) School districts and schools shall not establish a two-tier educational system by requiring a minimal educational standard and also offering a

second, higher educational standard that pupils may only obtain through payment of a fee or purchase of additional supplies that the school district or school does not provide.

(4) A school district or school shall not offer course credit or privileges related to educational activities in exchange for money or donations of goods or services from a pupil or a pupil's parents or guardians, and a school district or school shall not remove course credit or privileges related to educational activities, or otherwise discriminate against a pupil, because the pupil or the pupil's parents or guardians did not or will not provide money or donations of goods or services to the school district or school.

(c) This article shall not be interpreted to prohibit solicitation of voluntary donations of funds or property, voluntary participation in fundraising activities, or school districts, schools, and other entities from providing pupils prizes or other recognition for voluntarily participating in fundraising activities.

(d) This article applies to all public schools, including, but not limited to, charter schools and alternative schools.

(e) This article is declarative of existing law and shall not be interpreted to prohibit the imposition of a fee, deposit, or other charge otherwise allowed by law.

**Form 8.    Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>17-56006</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [5800] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [_____]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | /s/ Brad A. Denton | Date | Aug 30, 2018 |

("s/" plus typed name is acceptable for electronically-filed documents)

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## CERTIFICATE OF SERVICE
## SEALED DOCUMENTS
## INTERIM CIRCUIT RULE 27-13

**Case Number:**   17-56006

**Case Title:**   Tresona Multimedia, LLC v. Burbank High School Vocal Music Association et al.

*Note:*   Documents to be filed under seal are to be submitted electronically. As the parties will not have online access to those documents once they are submitted, the CM/ECF electronic notice of filing will not act to cause service of those documents under FRAP 25(c)(2) and Ninth Circuit Rule 25-5(f). Interim Circuit Rule 27-13(c) therefore requires an alternative method of serving the motion or notice to seal and the materials to be sealed.

○   I certify that I have provided a paper copy of the document(s) listed below to all other parties via personal service, mail, or third-party commercial carrier on the date noted below. *See* FRAP 25(c)(1)(A) – (C).

◉   I certify that, having obtained prior consent, I have provided a copy of the document(s) listed below to all other parties via electronic mail. *See* FRAP 25(c)(1)(D); Interim Circuit Rule 27-13(c).

## DESCRIPTION OF DOCUMENTS:

Appellant's Reply Brief;
Notice of Sealing Under Interim Circuit Rule 27-13;
Certificate of Service Sealed Documents Interim Circuit Rule 27-13

**Signature:**   /s/ Brad Denton

(use "s/" format with typed name)

**Date:**   08/30/18